476 So.2d 976 (1985)
Donald C. CARROLL, Jr.
v.
Katherine Annette Matthews CARROLL.
No. CA 85 0159.
Court of Appeal of Louisiana, First Circuit.
October 8, 1985.
*977 Charles R. Albright, II, Baton Rouge, for plaintiff-appellee Donald C. Carroll, Jr.
William R. Aaron, Baton Rouge, for appellees Gilbert Belew and Erma J. Belew.
Mary E. Heck, Baton Rouge, for defendant-appellant Katherine Annette Matthews Carroll.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This is a custody proceeding instituted by the paternal grandmother and her husband against the biological parents of two little girls. From the judgment dismissing both parents' reconvention for permanent custody and awarding the permanent care, custody and control of the children to plaintiffs, paternal grandmother and her husband, the defendant birth mother devolutively appeals. We affirm.

PRIOR PROCEEDINGS
In the proceedings entitled and numbered "Donald C. Carroll, Jr. vs. Katherine Annette Matthews Carroll", Number 51,633, the Family Court of East Baton Rouge Parish, Donald C. Carroll, Jr. was awarded the permanent care, custody and control of the children born during the marriage by judgment rendered on October 2, 1980 and signed on October 8, 1980; the judgment provided that the minor children "will reside with Donald C. Carroll, Jr. in the home of the paternal grandparents." By judgment of separation rendered October 24, 1980 and signed on November 19, 1980, the foregoing quoted language was perpetuated; it further specified the frequency and duration of the mother's right of reasonable visitation which the late Judge Thomas B. Pugh mandated "is to take place in the continuous presence of Mrs. Clare Heil, maternal greatgrandmother of the minor children" and expressly excluded Sunday from the visitation periods. The foregoing custody and visitation privileges language was perpetuated in the Judgment of Divorce read, rendered and signed on March 9, 1982 by Honorable Julian E. Bailes, Judge Pro Tem.

PRESENT CUSTODY PROCEEDINGS
On April 4, 1984 Irma Jean Belew and Gilbert Belew, the mother and step-father *978 of Donald C. Carroll, Jr., filed a petition for custody, in the above captioned and numbered suit, naming Donald and Katherine Carroll, the biological parents, as defendants. The Belews alleged that the girls, ages 5 and 6, when the petition was filed, "are now in a stable and happy environment with petitioners seeing to their physical, educational and emotional needs", their removal from the present environment "would be detrimental to the children, and it is in the best interest of the children" for their custody to be awarded to petitioners, and pending a decision on permanent custody their temporary custody should be given to petitioners "in order to maintain the continuity and stability of the environment... and in order to avoid unnecessary emotional distress."
Defendant birth mother filed, inter alia, a peremptory exception challenging the Belews' petition, alleging them to be "third parties to the minor children" with no standing to seek or obtain custody of the children because both biological parents were living, their rights as parents had not been forfeited by proceedings to terminate parental rights, and neither had been found to be unfit parents. The trial judge overruled the exception on June 27, 1984 and the trial began immediately thereafter; trial was continued on August 27 and September 5.
On September 6, 1984 the court gave its oral reasons for judgment, as follows, in pertinent part:
This matter having been submitted and taken under advisement, the Court, finding that an award of custody to either parent would be detrimental to the children and feeling further that the best interests of the children would thereby be served, this day awarded the care, custody, and control of the two minor children of this marriage to Erma Jean and Gilbert Belew.
The formal judgment, signed December 3, 1984, granted the Belews the permanent care, custody and control of the minor children, subject to reasonable visitation rights of the parents "all in accordance with the Written (sic) Reasons for Judgment." Only the birth mother, Katherine Carroll, appealed the judgment.

ASSIGNMENTS OF ERROR
Defendant-appellant, Katherine Carroll, assigns as errors the Trial Judge's:
1. Dismissing her peremptory exception of no right or cause of action;
2. Awarding custody to persons other than the children's natural parents without finding the parents unfit;
3. Finding that there was sufficient evidence to support the conclusion that the best interests of the children required that custody be awarded to non-parents; and
4. Allowing David Reiss, M.D., to testify.

ISSUES
The issues presented by this appeal are:
1. Did plaintiff's petition state a right or cause of action?
2. Whether a grandparent or other nonparent is entitled to the custody of minor children if: (a) one or both of the biological parents is living; (b) the parental rights of either of the parents has not been judicially terminated; (c) either parent has not been judicially declared unfit; and (d) either nondisqualified parent is willing to accept parental responsibilities under a judgment granting permanent custody.
3. Whether the evidence supports the trial judge's conclusions that (a) the best interest of the minor children required that custody be awarded to their paternal grandmother and step-grandfather and (b) to award the custody to either parent would be detrimental to the children.
4. Was it error to permit the emergency room physician who treated one child's burns on two separate occasions to testify and state his opinion as to their having been accidentally or intentionally inflicted?

PARENT VERSUS NON-PARENT IN CUSTODY DISPUTES
Citing Wood v. Beard, 290 So.2d 675 (La.1974) as her authority, defendantappellant, *979 Katherine Annette Matthews Carroll, hereinafter "Katherine", strongly urges that her peremptory exception of no cause or right of action should have been maintained and the Belews' petition for custody dismissed. Katherine argues that:
... [P]etitioners have no right of action to seek custody of these minors, which custody belongs of right to their fit and able parents. To afford third parties the opportunity, merely by petitioning the court, to challenge a parent's right to custody of his or her children, without having first obtained a determination of the parent's ... unsuitability does violence to parental rights and an injustice to the family unit.
Petitioners-appellees, the Belews, argue that "the changes in ... Civil Code Article 146 by Act 307 [of 1982] specifically authorized the award of custody of children to a non-parent ... if awarding custody to [a] parent and/or parents would be detrimental to the children, and that such an award of custody is in the best interests of the children." Characterizing Wood v. Beard, supra, as simply "prior jurisprudence", appellees state in their brief that they readily agree with opposing counsel that prior jurisprudence "has dictated that an award of custody to someone other than a parent requires a finding of unfitness or forfeiture of parental rights." However, appellees argue that C.C. art. 146, as amended in 1982, specifically "granted greater leeway in the award of custody to non-parents" as evidenced by the "specific use of the word `detrimental' in the article." Appellees rely on Boyett v. Boyett, 448 So.2d 819 (La.App. 2nd Cir.1984) as authority for their "greater leeway" argument.
Boyett v. Boyett, supra, pitted the maternal grandmother against the father of the child whose custody was in dispute. The mother had been granted the child's custody in August, 1980 when the couple divorced. Three years later the father petitioned for his daughter's custody, in the originally captioned and numbered suit, alleging abandonment of the child by the mother following her incarceration for distributing drugs, and was awarded custody. Unknown to the father, the maternal grandmother, about two and one half years previously, had obtained custody of the child through juvenile court proceedings in which the mother had relinquished custody in favor of the grandmother. The father filed for a writ of habeas corpus, seeking to compel the grandmother to deliver the child to him and she answered and reconvened, seeking the child's custody. In affirming the award of custody to the maternal grandmother, the Court, per Hall, J., reasoned, in pertinent part, as follows:
Our scrutiny of Art. 146 as amended by Act 307 convinces us that a change in the law has occurred. The prior jurisprudence had awarded custody to a nonparent in preference to a parent only in those situations in which the parent was unable or unfit to provide the child a home or had forfeited the otherwise superior parental right of custody. See Cawthorne v. Williams, 313 So.2d 915 (La.App. 2d Cir.1975), for example. The primary concern in making such awards was the welfare or best interest of the child, not simply the enforcement of parental rights. Wood v. Beard, supra at 677.
Under the article as amended, the primary concern remains the same but the judiciary has been given more freedom or latitude to pursue the goal of insuring that the best interest of the child is served in resolving custody disputes between parent and nonparent litigants. Presently, an award of custody to someone other than a parent can be made if it is found that awarding custody to the parent would be detrimental to the child and that the award to the nonparent is required to serve the child's best interest. LSA-C.C. Art. 146B.
Under prior law, custody awards to nonparents could be made in pursuit of the child's best interest only under those conditions previously discussed, a forfeiture of paramount parental rights or a finding that the parent was unfit or unable to provide a home. However, the use of the word "detrimental" in the new *980 act embraces a wider range of situations, including those previously recognized in the jurisprudence as cause for awarding custody to a nonparent. See 43 La.L. Rev. 759 at 774. It is reasonable to assume that had the Legislature intended merely to codify the existing law in this area they would have incorporated into the statute the familiar and oft-cited phraseology of the jurisprudence concerning parental rights. Instead, they chose to utilize language which broadens somewhat the range of situations in which a nonparent custody award is permissible. The amendment allows more freedom to pursue what has always been considered the primary consideration in custody cases, the best interest of the child or children involved.
However, this expansion of situations in which a nonparent custody award is permissible is coupled with a safeguard designed to prevent the needless erosion or abuse of the parents' superior right to custody. Art. 146 B. provides that the nonparent award must be "required" to serve the child's best interest. The use of the word "required" connotes necessity. In other words, the nature or extent of the detriment faced by the child under an award of custody to the parent must be such that it outweighs the parent's otherwise superior right and makes it necessary or essential, in pursuit of the child's best interest, that custody be awarded to the nonparent.
In sum, under Art. 146 as amended by Act 307 of 1982, a parent now enjoys a paramount right of custody which can be outweighed by a sufficiently grave detriment to the child's best interest, present in awarding custody to that parent, which requires that custody be awarded to a nonparent. 448 So.2d at 822-823. (Emphasis supplied by Judge Hall.)
In Johnson on Behalf of Johnson v. Earls, 464 So.2d 463 (La.App. 1st Cir.1985), we approvingly quoted the rationale of Boyett, supra, and upheld Family Court Judge Jennifer Luse's judgment awarding custody of a twenty-three month old toddler to the birth mother's cousin who had possession of the baby since the age of one month, reasoning, additionally, in pertinent part, that:
... [W]e find that the trial court is not required by law to find a parent unable or unfit to provide a home for the child before it can award custody of the child to a non-parent. Consequently, we will review the trial courts (sic) factual finding that awarding custody to the appellants [natural parents] would be detrimental to the child and that awarding custody to the appellees is required to serve the child's best interest. La.C.C. art. 146(B).
. . . . . .
After a careful review of the entire record, we find no abuse of the trial court's great discretion in the decision to award custody of the child to the appellees. Bagents v. Bagents, 419 So.2d 460 (La.1982).
In Berzins v. Betts, 457 So.2d 282 (La. App. 3rd Cir.1984), the Court affirmed the award of custody of a twelve year old girl to her maternal aunt and uncle, religious missionaries, who intervened in the custody petition filed by the man who had lived in open concubinage with the girl's mother, the custodial parent, approximately nine years before she mysteriously disappeared. The girl's father, who had remarried and was experiencing "severe marital discord for which he has sought counsel", also sought custody. The missing mother's paramour "admitted at trial that he openly kept pornographic magazines and nude statues in" his home. The Trial Judge's suspicions of collusion between petitioner Berzins and the girl's father were confirmed by the father's attorney, during a chambers conference with counsel for all litigants, who "verified that it was his client's intention to leave the child in the actual custody of Mr. Berzins in the event of [the father's] succeeding in this litigation" and the father's "testimony subsequently substantially bears out that representation." 457 So.2d at 284-285.
*981 In affirming the award of custody to the aunt and uncle, the Court, per Laborde, J., reasoned, in pertinent part, as follows:
After thoroughly reviewing the record, we find, as did the trial judge, that Johnny Betts intended to leave the child in the Berzins home had he been awarded custody. We find that an award of custody to Johnny Betts, who would then allow the child to remain in the Berzins home, would be both detrimental to the child and contrary to her best interest.
The record amply reveals that the Berzins home is unstable and unfit for proper care and development of the child....
Without any doubt, we find that the minor's continued residence at the Berzins home would be detrimental to her. We hold, as did the trial court, that the father ... has forfeited his paramount parental rights of custody because of his desire and obvious intention to leave the child with plaintiff.
In considering the best interest of the child, the evidence convinces us that custody of this child should be placed with her maternal aunt and uncle, ..., intervenors.... At the time of this trial, they were residents of Holland. They have a daughter twelve years of age who is compatible with [the child whose custody is in dispute.]
. . . . . .
We are impressed with the testimony of ... [the intervenors], as was the trial court, and are convinced that they are willing and able to provide a stable and suitable home for the minor ... It is inescapable that the best interest of [the child] ... is best served by placing her in the custody of the [intervenors] ... 457 So.2d at 285-286. (Brackets supplied by us.)
The soundness of the rationale of Berzins v. Betts, supra, is not diminished by the Court's statement, near the end of the opinion, that "this judgment is based upon the father's intent to allow the child to remain with the plaintiff ... and it is not forever conclusive." 457 So.2d at 286.
The age of the child in Boyett, supra, is not revealed by the opinion; however, it is clear she was at least three years old when her father filed for a writ of habeas corpus. As stated earlier, the child in Berzins, supra, was twelve years old when the custody proceedings were tried. The child in Johnson v. Earls, supra, was twenty-three months old when the custody proceedings were tried. In all three cases, decided after the 1982 amendment to C.C. art. 146, non-parents prevailed in custody contests with natural, or biological, parents. The only case of the three named which utilized testimony of a psychologist was Johnson, supra. Not even the known living parent in Berzins, supra, or in Boyett, supra, was declared unfit and in neither case was the parental rights of either father terminated. In Johnson, supra, the trial court did not find either biological parent either unable or unfit to "care for the child" although this Court made reference to some salient facts in the record which indicated instability of both parents, coupled with indifference by the biological mother.
Defendant-appellant Katherine's first and second assignments of error are without merit. We find that the trial court is not required by law to find a parent either unable or unfit to provide a home for their children before the court can award custody to a non-parent.

SUFFICIENCY OF EVIDENCE
We now review the record to determine whether the Trial Judge's conclusion "that an award of custody to either parent would be detrimental to the children and ... that the best interests of the children would thereby be served ... [by awarding] the care, custody, and control of the ... children..." to plaintiffs-appellees, the paternal grandmother and her husband, is supported by the preponderance of the evidence.
We observe, at the outset, that we do not have the benefit of detailed written reasons for judgment. Considering the volume and variety of domestic relations litigation which the Family Court must handle, we *982 readily understand why detailed reasons for the conclusions of detriment and the children's best interest were not given.
In Berzins, supra, the Court stated the well-settled jurisprudential rules that:
In child custody cases, the trial judge is vested with a vast amount of discretion in making a determination of custody. On appellate review, great deference must be accorded to the decision of the trial court, not only because of that court's better capacity to evaluate witnesses, but also because of proper allocation of trial and appellate functions between the respective courts. Bagents v. Bagents, 419 So.2d 460 (La.1982); ... The trial judge is in a better position to evaluate the best interest of a child from his total overview of the conduct and character of the parties. His discretion will not be disturbed on review in the absence of a clear showing of abuse thereof.... 457 So.2d at 286. ACCORD: Johnson on Behalf of Johnson v. Earls, supra, at 466.
In addition to Mr. and Mrs. Belew's testimony, plaintiffs relied on the testimony of four lay witnesses and two experts, in addition to Donald and Katherine Carroll on cross-examination.
The testimony of the Belews establishes that: the children were well cared for in a large, comfortable home with a large, fenced in back yard equipped with a variety of playground equipment; the Belews bestowed upon the little girls the much needed love and affection which neither parent supplied during the early part of their lives before the parents separated; the father, while living in the home with his mother and the children, paid no attention to the children and generally ignored their overtures seeking some sign of affection from him; appellant, Katherine, visited only sporadically from October, 1980, when the children were placed in the Belews' home, until these custody proceedings were instituted; the children did not want to visit their mother, even in the presence of the person designated by the Court in 1980 to supervise visitation of the mother with them; and after Donald Carroll's remarriage in April or May, 1982, the girls became upset every time their father came to take them to his home to visit with him, his wife, and step-daughter who was four years old when these proceedings were heard. Additionally, the Belews' testimony, corroborated by teachers from the private school the Belews sent the children to, established: the existence of a strong and loving bond between the children and the Belews; Mrs. Belew's considerable involvement in school activities of the children, including helping with parties and field trips; Mrs. Belew's helping the children with their school work as needed; Mr. Belew's transporting the children to and from school and participating in school programs held in the evening hours; the Belews' active participation in church activities with the children, including taking them to Sunday School and sitting with the children during regular worship services. All except a few months of the children's lives have been spent with the Belews.
Mrs. Toni Wiggins, Director of the Pre-School at Lanier Baptist Church, gave her assessment of Tara, at age 4, when Mrs. Belew enrolled her there in August, 1981 and Angela, at age 3, when she was enrolled initially. Mrs. Wiggins characterized the children as "clean and well dressed" but "withdrawn" and "unhappy little children" who "would not look at us eye to eye" and who "wouldn't talk to us." She stated that after a while they "began to respond", "became very loving"; a "tremendous change in ... their attitude toward being with people" took place; "they began to play with the other children ... and we ... saw a big change over this period of one year" and "this second year was a tremendous change." Mrs. Wiggins observed "regression" in Angela "the last few months before school ended" in 1984, about the time the father showed a revived interest in having the children visit him overnight, which regression manifested itself in poor quality school work and general unhappiness and unrest at school.
*983 Mrs. Tommie Morden, Tara's Sunday School teacher, who also taught her in her first year at Lanier's Pre-School kindergarten, stated that she "was very, very withdrawn for a three year old" in August, 1981 and required "special care, due to the circumstances that she had come to the Belews and that she had been physically and mentally abused." However, Mrs. Morden stated "by the end of the [1981-82 school] year [Tara] had become very well adapted to the classroom environment" and "was able to do all her classroom work." While Tara was in another teacher's classroom her second year at Lanier, Mrs. Morden testified that she maintained a relationship with Tara at school and at church and Sunday School. Mrs. Morden attested to the stability of the Belews relationship with both girls, stating "they are very devoted to Mr. and Mrs. Belew and I think they consider their home with the Belews as their home", a place she visits on occasion and has found to be a "very clean house, average home" although "cluttered with the kids things [but] with little children, you have clutter." As Tara's first grade Sunday School teacher, Mrs. Morden noticed Tara "began regressing" several months before the June 27, 1984 phase of these custody proceedings; she became shy, timid and refused to follow instructions or "talked back" to the teacher, "something that Tara had never done."
Mrs. Cynthia Cotton, Angela's Sunday School teacher, testified that during the two years Angela was in her class "she grew into a happy child and she went from being so fragile that we just felt like we always had to work with her and be concerned about her." Mrs. Cotton also stated that, in her dual roles as Pre-School teacher and Sunday School teacher at Lanier Baptist Church and School, she observed the children's progression and, early in 1984, their regression. She kept the children at her home for extended hours during the time of Mrs. Belew's open heart surgery and recuperative period, at Mr. Belew's request. Mrs. Cotton attested to the nurturing, loving relationship which existed between the Belews and the little girls; she and her children, the same age as the Carroll children, enjoy a social relationship with the Belews other than their church and school contacts.
Mrs. Polly Winter, a neighbor of the Belews for fourteen years, knew of and testified that the Belews loved, nurtured and provided for the children in an exemplary fashion, and put considerable effort into helping "to get the children to be independent" rather than "cling" to Mrs. Belew; the Belews did succeed in that regard but within the few months before the June 27, 1984 hearing Mrs. Winter testified the girls had become frightened at the prospect of visiting in their father's residence, a distance of about two blocks from the Belews' home.
Alan L. Taylor, Ph.D., accepted by the Court as an expert in the fields of clinical psychology and clinical child psychology, testified on behalf of plaintiffs. He testified that he had evaluated and/or counseled the children on four visits in 1984 to his office over a span of several months. The first visit was utilized to administer intelligence tests and the first phase of "psychological testing" which was followed through in subsequent visits. He found Angela to be "a good bit above [average] in her [intellectual] abilities compared to other children her age at the beginning of what is called the superior range" and found "Tara to be functioning at an average level of intelligence compared to children her age." In subsequent visits Tara "was exhibiting some anger and ... passive aggressiveness" and "indicated that some of these feelings had to do with not getting things settled and wondering what was going to happen." Angela, he noted, "was much more regressed than she had been initially" and "acted in a very babyish fashion." At the first and subsequent visits to Dr. Taylor, the children, in response to direct questions, stated it was their preference to live with the Belews but that they had no objection to visiting their parents but did not want to live with either of them.
*984 Dr. Taylor stated his opinion of the relationship between the Belews and the children, thusly:
... My general impression is that they identify Mr. and Mrs. Belew as what I would term psychological parents; and by that I mean the figures that children look to for such things as parents normally provide such as physical care, sustenance, support, emotional support and general caretaking. In terms of their emotional and social development, that term, the psychological parent, basically encompasses the majority of what we normally think of parents providing to children.... Psychological parents refers to the one who is perceived and related to in the fashion of a normal parent-child relationship.... I definitely feel that ... both of these children perceive them [the Belews] as their psychological parents.
Dr. Taylor stated that, in his opinion, it would definitely not be in the best interests of the children to remove the children from the Belews and that it would be a serious detriment to their physical and mental well being, which detrimental effects would have both short term and long term duration, including "their future ability to ... have their own children, parent those children and in general relate to other people."
"By a preponderance of all the materials that I have access to" Dr. Taylor voiced the opinion that the children "do want to stay" with the Belews and also that their best interests will best be served by letting them remain with the Belews.
David Reiss, M.D. was accepted by the Court as an expert in general medicine, emergency medicine, and in the recognition, care and investigation of abuse cases. Dr. Reiss testified that he had seen Tara in the emergency room of Dixon Memorial Hospital, Denham Springs, Louisiana on two occasions when she was three years old. The "grandparents and father" on one occasion and the grandparents on the second occasion had taken the child there for treatment of burn wounds on her abdomen and shoulder. The two visits were three or four weeks apart. Dr. Reiss stated "there was no doubt" in his mind that the burns had been "intentional" because of the severity of the burns and the child told him both times that her "mommy burned" her. He stated that on both occasions of treating the child he "wanted the child admitted" to the hospital. On each visit the grandparents related to Dr. Reiss that they had just come from picking up the children at her mother's place. He testified that the burns were not compatible with Katherine Carroll's explanations that (1) the first burn was caused when sulphur from a match dropped on her abdomen when Katherine struck the match and (2) the second burn was caused by the child bumping into a lighted cigarette during a trip to the zoo. Dr. Reiss stated that he testified to the same effect at the custody hearing which culminated in the Judgment on Rule rendered October 2, 1980 and signed on October 8, 1980, referred to at the outset of this opinion.
There is nothing in the record to indicate whether Dr. Reiss, after either of the two visits, complied with the mandatory duty imposed on him by R.S. 14:403 (C)(1) and (D).
Defendant-appellant Katherine, her mother and her grandmother, all testified that Katherine was a kind and loving mother whose efforts to visit the children were constantly thwarted by the Belews who set too many conditions on visitation; on crossexamination, Katherine and her grandmother, who had been designated in the Judgment of Separation as the person in whose presence Katherine must exercise her visitation privileges, admitted that the conditions were those set forth in the custody decree rendered by Judge Pugh in 1980. Katherine's brother testified that the burn on Tara's abdomen when she was two years old was caused when "the sulphur came off" a match taken from "a thing of book matches" when she struck it to light a cigarette as Katherine, Tara and the brother sat on a couch watching television.
*985 Donald Carroll, A.J. Dantoni, Joseph Garrett and James Overstreet, friends of Carroll, testified that Carroll was a kind and loving father who cared deeply for his children and demonstrated much affection for them. However, all four testified that Mrs. Belew, in particular, threw obstacles in the way of his visiting with the children after he remarried in 1982. They paint a picture of a father as pure as the wind driven snow.
Defendant-appellant Katherine points out in her brief that when these proceedings were heard below Mrs. Belew was 47 years old "and has had a heart attack and surgery in connection therewith" and that Mr. Belew was 72 years old at trial. She then argues that "to allow the Belew's (sic) to retain custody would, in all probability, require yet another custody determination prior to the majority of the minors" and that "it would also leave the children to be raised through late childhood and adolescence by custodians of questionable health and physical ability." A main thrust of Katherine's counsel's cross-examination of Mr. and Mrs. Belew was to have the Trial Judge believe both were eligible for "over the hill" status. Because of Mrs. Belew's by-pass surgery, which she stated was a complete success, appellant's counsel attempted to show Mrs. Belew had one foot on a banana peel and the other in the cemetery. Although Mr. Belew was "72 years young", as he stated it at trial, he was actively engaged in the business of buying, reconditioning and reselling secondhand heavy duty construction equipment in Louisiana and surrounding states. He characterized his health as very good and stated he did all the yard work at home although not as often as Mrs. Belew would like for him to do it. Without objection from either Donald or Katherine Carroll's counsel, Mrs. Belew read into the record a letter from the family physician, a Family Medicine specialist, attesting to the good health of both Mr. and Mrs. Belew.
Defendant-appellant Katherine argues that, over her objection, Dr. Reiss "rendered irrelevant and highly prejudicial testimony concerning his treatment" of Tara in December, 1980, especially his "freely rendered" opinion that the child had been abused. She argues "it is ludicrous to conclude that two small burns over the space of one month is evidence of abuse" and states that "the inference that she ... abused the children" is not substantiated by testimony. We disagree with the characterization of Dr. Reiss' testimony as irrelevant. He testified as a physician whose expertise included recognition, treatment and investigation of abuse cases and his opinion is entitled to as much weight as the trier of fact chooses to give it. The testimony did certainly hurt appellant's case; the truth frequently hurts.
Donald Carroll's second wife testified that she had tossed his clothing out of the house once following a verbal altercation but she and Carroll were getting along now. On cross-examination she admitted that Donald and Katherine, defendants in the petition for custody, had "gotten together,... became friends" on the custody contest because the children "need to know both of their parents" and that if either parent prevailed against the Belews they would let one parent have the children sometimes and the other parent have them sometimes.
The Trial Court awarded the custody of the children to the paternal grandmother and her husband, both of whom had been providing them with a stable and wholesome environment for all but a few months of each child's life. C.C. art. 146 authorizes an award to a non-parent who has been providing a wholesome and stable environment when to do otherwise would be detrimental to the children and not in their best interest. Our review of the entire record convinces us that the Trial Court did not abuse its great discretion in awarding custody of the children to appellees, the Belews. The record overwhelmingly supports the award of custody to Mr. and Mrs. Belew. The third and fourth assignments of error are without merit. Accordingly, the judgment is affirmed.
*986 All costs incurred at the trial court level are cast against both defendant-appellant, Katherine Annette Matthews Carroll and her former husband, Donald C. Carroll, Jr. Defendant-appellant, Katherine Annette Matthews Carroll, is cast for appellate costs.
AFFIRMED.
EDWARDS, J., concurs in the result.