501 So.2d 862 (1987)
In re Verina Kraemer, Wife of and Terry P. BOURG, Applying for Adoption of Jacqueline Chantel Keller.
No. 86-CA-458.
Court of Appeal of Louisiana, Fifth Circuit.
January 12, 1987.
Raymond C. Burkart, Jr., New Orleans, for appellant Vanessa Keller Cavalier.
Leon C. Vial, III, Julie Burke, Hahnville, Richard Ducote, New Orleans, for plaintiffs-appellees.
Before CHEHARDY, KLIEBERT and BOWES, JJ.
BOWES, Judge.
Appellants Vanessa Keller, wife of/and Morris Cavalier, appeal a judgment of the trial court awarding permanent custody of the minor child Jacqueline Keller to Mr. and Mrs. Terry Bourg. We affirm.
Jacqueline Keller was born on September 26, 1980, to Vanessa Keller, then unmarried. Within a short period of time following the child's birth, Ms. Keller began to leave Jacqueline in the care of her uncle and aunt, Mr. and Mrs. Terry Bourg. In the beginning, it was Ms. Keller's employment *863 which necessitated that she find adequate care for her child during working hours. Through the next months, Ms. Keller left Jacqueline at the Bourgs' home for gradually increasing periods of time. By the age of eighteen months, Jacqueline resided with the Bourgs on a full-time basis, at the Bourgs' suggestion and with the full agreement of the child's mother.
In January, 1982, a document entitled "Appointment Of Tutor By Parent And Assigning Of Temporary Custody By Vanessa Claire Keller For Jacqueline Chantel Keller" was executed purportedly assigning custody of Jacqueline to the Bourgs, as well as appointing the Bourgs as Jacqueline's tutors. This document was allegedly signed in order to permit the Bourgs to obtain medical treatment for Jacqueline should it become necessary. However, the Bourgs contend it was intended to have more permanent meaning.
After Jacqueline became established in the Bourg household, Ms. Keller visited frequently at the Bourg home. Mr. Bourg stated that following these visits, and visits by Jacqueline's maternal grandmother, Jacqueline became upset and difficult to manage. Consequently, the Bourgs arranged with Ms. Keller to schedule visits in order to allow them to prepare the child in advance. Visitation then became less frequent.
In 1984, Ms. Keller married Morris Cavalier and moved to New Orleans. The Cavaliers attempted to arrange visitation with Jacqueline on alternate weekends to coincide with visitation of Mr. Cavalier's children from a previous marriage. However, the Bourgs and the Cavaliers could not reach an agreement as to visitation because of Jackie's erratic behavior following visits. Mrs. Cavalier then executed a revocation of the earlier temporary custody agreement. The Bourgs countered with a petition for adoption of Jacqueline and for enforcement of the earlier custody agreement.
Pursuant to this petition, Mrs. Cavalier filed a petition for a writ of habeas corpus in January, 1986, which was denied by the trial court. The merits were taken up on February 20 at which time the court took the matter under advisement pending an evaluation of all parties and report from Dr. Alan Klein, a psychologist. On March 21, the hearing was completed and, on April 23, judgment was rendered granting permanent custody of Jacqueline to the Bourgs; Mrs. Cavalier was granted visitation and ordered, along with the Bourgs, to undergo mental health counseling. It is from this judgment that the Cavaliers appeal, assigning as error that the trial court erred in its award of permanent custody to nonparents and in failing to establish a set time frame within which a gradual transition of custody to the mother would take place.
La.Civil Code Article 146(B) is applicable to the present situation:
Before the court makes any order awarding custody to a person or persons other than a parent without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child. Allegations that parental custody would be detrimental to the child, other than a statement of that ultimate fact, shall not appear in the pleadings.
In the case before us, the trial judge expressly determined that an award of custody to Jacqueline's mother would be detrimental and an award of custody to the Bourgs would serve in the best interest of the child. This finding was based on Dr. Klein's report. The report, to which both parties stipulated, stated:
The evaluation of Jackie reflected an unusually high level of anxiety which appears to be developing into an enduring characteristic of her personality. The early separation experiences of Jackie from her biological mother quite likely is the cause of her insecurity at this time.
The Bourgs provided me with progress notes completed by her teacher at Hahnville Elementary School. These reports also noted an unusually high level of anxiety and insecurity in this child and *864 further suggest a Separation Anxiety Disorder. The primary feature in such disorders is a clinical picture in which the predominant disturbance is excessive anxiety on separation from major attachment figures. Where separation occurs, there can be anxiety to the point of panic. Young children with this disorder often show clinging behavior and fear of going to sleep at nighttime. Jackie has demonstrated both of these behaviors in school and at home (by report).
Jackie has developed a mother-child, father-child attachment and both parents are obviously very bonded to Jackie. She is a psychologically wanted child and after four plus years in the Bourg home, she has become firmly fixed in the family structure. In my opinion, were Jackie to be separated from her psychological parents, her condition would become exacerbated. Separation disorders, in their severe form, can be incapacitating in that such children may be unable to attend school or function independently in many areas of their life. Separation disorders, even in their mild form, often persist for a number of years.
Based upon the data I have available, I am recommending that Jackie be allowed to continue living in the Bourg home. There needs to be a sense of permanency for her, however this may be achieved legally. Were there to be an adoption, this would ideally be an open adoption. Given the relationship between the biological mother and the Bourgs, I do not see how an adoption could be done otherwise. As noted above, the Bourgs have indicated that they are willing to have the Cavaliers to have visits with Jackie.
We find support for the trial judge's conclusions elsewhere in the record besides Dr. Klein's report. Dr. Ellen McKenzie, Jacqueline's treating psychiatrist, agreed with Dr. Klein's assessment via a report to the court. Moreover, Mrs. Cavalier's conduct (as distinguished from her early difficult circumstances) appears to have contributed substantially to the present difficulties. As an unmarried young mother, she obviously needed to support herself and her child, and so began to work. However, Mr. Bourg testified when the child was somewhat over a year old, he and his wife had a talk: "and we decided that if Vanessa was ever going to have a chance with Jacqueline for a mother-daughter relationship, that they would have to do it then, so we told her we couldn't keep Jacqueline any more." Jacqueline spent the next three weeks with her mother in a mobile home in Paradis. Then, Mr. Bourg stated, he learned that the toddler was playing outdoors alone and unattended, and Mr. Bourg went to see for himself.
He testified as follows:
... and I went over to Vanessa's trailer and she was indeed knocked out. And I woke her up and I asked her what, you knowI said, "You having some problems or something?" And she said, "Yeah." She said, "I can't cope with raising a child." And I said, "Well, you know you have a little girl. You're going to have to decide what you want to do." I said, "You know, she's outside playing by herself." And she said, "Oh, they [sic] just making a big noise about it. She was inside playing but somebody opened the door and she got out." I said, "Well, what do you want to do, you know?" She said, "Well, I don't have any place to leave her and I can't run a business and raise a child, too." I said Vanessa, "If you want, Jacqueline can live with us, you know, but we're going to have to lay down some ground rules to protect Jacqueline." So she said, "Really? You mean it? She could live with you until she's an adult?" And I said, "Yes, if that's what you want." So she said, "Yeah." I said, "Well, don't make up your mind now. I'll take her to spend the night with us and I'll stop and see you tomorrow and see what you want." So I did that.
We left Paradis and went back to Hahnville with Jacqueline, brought her to our house. The next day I stopped at Vanessa's bar in Hahnville and talked to her. And she again told me that she wanted Jacqueline to live with us but I *865 wouldn't accept that decision because it was, you know, I wanted her to think about it. At that time we talked about, you know, if Jacqueline would live with us, if that's what Vanessa wanted and I agreed to it, that we would all do whatever was best for Jacqueline because at that point we all realized that she had a problem of insecurity, which Vanessa and I had talked about previously. And I told her that, you know, take a week and think about it. I wouldn't even stop there to get a Coca-cola or a root beer, which I was in the habit of doing, so that she could think about what she wanted to do with her daughter. And I stayed away from there for one week. And I went back and talked with Vanessa again. And she assured me that that's what she wanted, she wanted Jacqueline to live with us. And I said, "Well, I understand that but take another week and think about it then give me your answer because it's an important decision and it's something that you can't change without ruining the child." So, she said, "Okay."
So, I stopped the following week and she again reirritated (phonetic) that she wanted Jacqueline to live with us, even if it meant that she would never see her again, which I assured her that's not what I had in mind, to ever exclude her from Jacqueline's life. She agreed to that. I said, "Well, you only have one other thing to do. If that's what you really want, you have to go to my house and tell my wife that because we want to make sure there's no misunderstandings in this. It's too important." And she did. She went to my house either the next day or a couple days later and sat down and told my wife the same thing, that she wanted Jacqueline to live with us.
At that time she asked us, that particular day, she said, "I only want y'all to do one favor for me and that's not change her name and don't make me sign any more papers because I've already signed custody papers for you." I said, "Okay, you know, that's fine as long as you understand that, you know, we have to do what's best for Jacqueline. We don't want to hurt her. She's a young child." And she agreed to that.
Although present in court and given the specific opportunity to dispute this testimony, Mrs. Cavalier did not do so. A copy of a letter sent by Ms. Keller to the Bourgs in 1984 further indicated her attitude toward the situation:
... You took over my responsibility and gave me my freedom to make a life for myself ... Sometimes I feel very guilty for running out on my responsibility but I know she's where she belongs. I love her very much and always will. I think of her all the time and sometimes miss her very much but I see what a fantastic job you have done with her security and her life ... My thanks also goes to Nina, Gia, and Gaston. You couldn't ask for 3 better sisters and brothers. It's easy to see they love her and don't resent having a little sister to help raise. [emphasis supplied]
Our opinion in State In The Matter of Williams, 447 So.2d 1211 (La.App. 5th Cir. 1984) would appear to place a more stringent burden of proof in custody cases concerning a parent and a nonparent than subsequent cases from other circuits. See, e.g., Boyett v. Boyett, 448 So.2d 819 (La. App. 2 Cir.1984). We note that Williams cited LaPointe v. Menard, 412 So.2d 223 (La.App. 3 Cir.1982), the holding of which was applicable under C.C. 146 prior to its amendment[1] dealing with nonparental custody. Further, it is evident that the strong requirements of Williams were intended to be confined to the particular facts of that case, (or similar facts), most notably the complete lack of evidence of any kind to justify removal of the children from their father's custody. Mr. Williams had legal and physical custody of his children when *866 the grandparents sought and were granted a change of custody by the trial judge. Mr. Williams was accused of being an unfit parent, which we found not to be the case, and our opinion was written to address that issue.
We find that in cases such as the present one, where the question of parental fitness is not specifically at issue, that the burden of proof on the nonparent seeking custody is less harsh under C.C. 146 as amended. The trial court is given more flexibility in determining when parental custody is "detrimental" to the childthat is, for example, when the physical, mental, and emotional well-being of the child is at stake. We agree with the Second Circuit in Boyett, supra that the use of the word "detrimental" in the new act embraces a wider range of situations, including those previously recognized as cause for awarding custody to a nonparent. As our brothers recognized in Boyett, the amendment to C.C. 146, in which the award of custody to a nonparent is permissible, allows more latitude to the judiciary to pursue what has always been considered the ultimate goal in custody casesthe best interest of the child involved.
Considering the above, we find that the instant case is an appropriate one for a nonparental custodial award at this time. The evidence in the record convinces us that early in Jacqueline's life, Mrs. Cavalier made a well considered and voluntary decision on behalf of herself and her daughter to permit Jacqueline to be raised as a child of the Bourgs. We are profoundly sympathetic with Mrs. Cavalier and cognizant of the unfortunate circumstances which apparently led her to do this and which resulted in the present situation. However, it is also evident that in terms of Jacqueline's psychological development, the die has been cast, at least for the time being. The testimony of the Bourgs in regard to Jacqueline's integration into the family is fully substantiated and corroborated by the reports of the professionals. Notwithstanding the paramount right of a parent to custody of his or her children, we find there were compelling reasons for the trial court's award of custody to the Bourgs. Likewise, we can find no manifest error in her conclusion that an award of custody to the parent (at this time) would be detrimental to the child and the award of custody to the Bourgs is required to serve the best interest of the child.
Further, we do not read either the judgment itself or the doctors' reports to forever preclude Mrs. Cavalier from obtaining custody of Jacqueline. An attempt at psychological bonding between mother and daughter is a major objective of both the doctors and the court. Other changes of circumstances may also bring the present arrangement to a suitable posture for a variation in custody, at which time appellant may apply to the trial court for a change. That court's order of a progress report on the counseling of both sets of parents will keep the judge apprised of improvements made in the entire situation.
Courts are frequently called upon to exercise the biblical wisdom of King Solomon in custody decisions. The learned trial judge here appears to have attempted just that. Only time will tell if she has succeeded, but, for the present, we find no error in her conclusions and therefore affirm the judgment of the trial court. All costs of this appeal are assessed to appellant.
AFFIRMED.
NOTES
[1] Prior to the 1982 amendment which added statutory provisions for determining nonparental custody, the existing rules regulating custody between parents and nonparents were jurisprudentially developed. See, e.g., Wood v. Beard, 290 So.2d 675 (La.1974).