539 So.2d 965 (1989)
Carl Edward HUGHES and Jackie D. Hughes, Appellants,
v.
John S. McKENZIE and Margaret S. McKenzie, Appellees.
No. 20322-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1989.
Rehearing Denied March 23, 1989.
Writ Denied May 19, 1989.
*966 Hamilton & Carroll by Donald K. Carroll, Oak Grove, for appellants.
Leo A. Miller, Jr., Lake Providence, for appellees.
Before FRED W. JONES, Jr., NORRIS and HIGHTOWER, JJ.
NORRIS, Judge.
This is an appeal by Jackie and Carl Hughes, the parents of the minor child Saphronia Hughes, from a judgment in a habeas corpus proceeding granting Saphronia's custody to Margaret and John McKenzie and allowing the Hugheses visitation. We amend in part and affirm.
Carl and Jackie Hughes were married July 8, 1977. Jackie had one child before they were married, and there are four daughters born of the marriage. Saphronia (Sophie), the youngest, was born December 15, 1982. Although Carl Hughes never filed an action to renounce, the record reflects that the Hugheses both believe he is not the biological father of Sophie.
At the time of Sophie's birth the Hugheses were having marital difficulties and Jackie was experiencing health problems. Approximately three days after Sophie was born Margaret McKenzie (then Putnam), Jackie's first cousin, with Jackie's consent, took Sophie to live with her and her husband. The long term arrangement was indefinite. Sophie has lived with Margaret and her current husband, John, for most of her life. Carl and Jackie began living apart two or three months after Sophie's birth, and then went through periods of reconciliation and separation. They reconciled and reaffirmed their marriage vows in the spring of 1986. In December 1986 they first attempted to have Sophie returned to their home.
One weekend in December 1986 Margaret McKenzie refused to allow the Hugheses visitation because she had been told they might try to keep Sophie. On December 30, 1986 the McKenzies obtained a court order designating them as co-tutors of Sophie. The Hugheses allege they were not given notice of the petition for tutorship, and that the order was issued in an improper venue. In the instant judgment the trial judge specifically declined to rule on the validity of the prior tutorship order.
On January 23, 1987 a meeting took place between Jackie Hughes, the McKenzies, and their respective counsel. After her attorney left, Jackie Hughes signed a joint motion styled a "Motion to Establish Residence." Based on this motion, the district court issued an order approving the living arrangements specified in the joint motion. The order provided that during the school year Sophie was to reside with the McKenzies Monday through Friday and the Hugheses on weekends; during the summer she would alternate weeks at each residence.
On March 16, 1987 the Hugheses filed a petition for writ of habeas corpus requesting custody of Sophie and a rule to show cause asking that the December 30, 1986 tutorship order and the January 23, 1987 residency order be declared null and void and set aside. The parties stipulated that all matters raised by the pleadings would be dealt with at the same time, and no exceptions were filed. The hearing took place on April 16, April 29 and August 25, 1987. There was extensive testimony concerning the Hughes and McKenzie households, marital histories, and relationships with Sophie.
Margaret McKenzie has been married three times. While she had custody of Sophie she lived with her third husband, *967 John McKenzie, before their marriage in 1984. However, Mrs. McKenzie testified that they were married as soon as the divorce settlement was final from her second marriage, and the trial judge found no indication that their marriage is in any way unstable. Unquestionably, the McKenzies have provided Sophie with a loving and stable home. Jackie Hughes admitted that she was satisfied with the care Sophie had been given. The evidence showed that during the day Sophie stays with Margaret McKenzie at the daycare she owns. Sophie participates in local church activities, as well as swimming, gymnastics and dance lessons. The McKenzies take her camping and bike riding. Sophie interacts well with Margaret's two 17 year old daughters, and with John McKenzie. Sophie has had a nurturing and loving relationship with the McKenzies, as well as many material advantages. They live in a 4-bedroom, 3-bath house with a pool. The Hugheses have never contributed to Sophie's support while she was living with the McKenzies.
Carl changed jobs after the April hearing dates, and the Hugheses moved to a different home. As of the August hearing date, the Hugheses were living in a 3-bedroom, 2-bath brick house in a rural area of Morehouse Parish. The Hugheses and several of their neighbors and friends testified that when Sophie visits the Hugheses she relates well to her four sisters and her parents. They also said that Jackie is a good housekeeper who keeps her children clean and well fed. There were no allegations that the children were either physically abused or neglected. Carl and Jackie take the children fishing, swimming, bike riding and pony riding. Carl and Jackie attend church infrequently, although they testified a neighbor takes the children to Sunday School and summer Bible classes. Jackie has only a seventh grade education. All the daughters in the Hughes's household have experienced some academic difficulty; the eldest has been held back two grades and each of the others, one grade.
The Hugheses have experienced serious marital difficulties. Carl Hughes has had a sexual relationship with one woman, Melba Martin, that has continued over a period of seven years. Melba is Jackie Hughes's cousin; she lived with Jackie and Carl when she was a child. When Melba was only 13, and still living in their home, Carl, then 23, initiated a sexual relationship with her. This affair began in 1980 and continued for one and one half years while Melba was still living with the Hugheses. Carl then left Jackie, took Melba with him, and the two of them began living together, declaring that they were going to be married. At that time Melba was 15 and Carl was 25. They lived together for approximately 8 months. When Carl learned that Jackie was pregnant with Sophie, he returned and lived with her during the spring and summer of 1982. He then moved out and resumed living with Melba. Carl testified that at the time Sophie was born he was living with Jackie, although he moved out a few months after her birth and once again began living with Melba. He and Melba lived together continuously from around March of 1983 until March of 1986, except for one period when he returned to Jackie. Melba and Carl separated in March of 1986 because Melba began seeing other men and told him to leave. Shortly thereafter Carl and Jackie re-affirmed their marriage vows and once again began living together. On cross-examination Carl admitted that in December of 1986 he went to a night club with Melba, spent most of the night at her house, and engaged in sexual intercourse with her. He told Jackie, she forgave him, and they continued to live together.
During their periods of separation, Jackie was receiving food stamps and welfare. In the two years prior to their April 1986 reconciliation she had eight different residences. Since their 1986 reconciliation the Hugheses have lived at two different locations. The Hugheses testified that their marriage and lifestyles had become much more stable since their last reconciliation and the reaffirmation of their marriage vows. Jackie testified that from April to December of 1986 she had visited with Sophie for approximately three weekends, and also 5 days in December. Melba said that when she was living with Carl she *968 would pick up the children for his visitation, but never brought Sophie, even when she was with the other children. Carl admitted saying in the past that he had no feelings for Sophie because she was not his child, but denied the truth of this statement.
Pat Meriweather, a social psychologist, testified at trial. Meriweather had examined Sophie on April 7, 1987. She also spoke with John and Margaret McKenzie and received from them an account, which the trial court characterized as accurate, of Sophie's history. Meriweather said that the McKenzies' home was the only permanent home environment Sophie had ever known, and was the center for her sense of security. In her opinion, Sophie would be extremely traumatized if she were taken from her present environment with little preparation. Meriweather also expressed concerns about the chronic instability of the Hugheses' marriage and Carl Hughes's ongoing relationship with Melba. Meriweather's recommendation was that the McKenzies have primary custody of Sophie, and Jackie Hughes be given a chance to demonstrate a stable home and a strong commitment to the child and to develop a bond with her before there was any attempt to permanently reunite Sophie with the Hugheses.
On April 20, 1988, the trial judge awarded the McKenzies primary domiciliary custody of Sophie, and granted the Hugheses visitation every other weekend during the school year and on alternate weeks during the summer months. The trial judge followed In re Custody of Reed, 497 So.2d 1084 (La.App. 4th Cir.1986) in using LSA-C.C. art. 146(B) as a guideline. In comprehensive written reasons for judgment, the trial judge found that Carl Hughes "has not proven his reliability or dependability as a father figure for Sophie," and that given his recent past behavior he could not provide a stable environment for his family. The trial judge also recognized the potential danger of returning the care of Sophie to a man who had previously initiated a sexual relationship with a young child under his care. Placing special emphasis on Pat Meriweather's testimony, the trial judge found that at this time removing Sophie from the environment of the McKenzies' home, the only secure environment she has ever known, would most definitely be detrimental to her welfare and that the award of custody to the McKenzies was required to serve the child's best interests.
The Hughes appeal, with four assignments of error:
(1) The testimony that Carl Hughes was not the biological father of Saphronia Hughes was inadmissible.
(2) The provisional tutorship and tutorship orders should have been set aside.
(3) The January 23, 1987 order of joint custody should have been declared null and set aside.
(4) The court erred in granting custody of the minor child to non-parents.

ASSIGNMENT NO. 1
Appellant's first assignment is that the court erred in permitting and considering, over objection, testimony that Carl Hughes is not the biological father of Sophie. Carl Hughes had a vasectomy before Sophie's conception, and both he and Jackie believed that Sophie was not his child.
The testimony was not intended to rebut the presumption of paternity under LSA-C. C. art. 184 but to show Carl's possible feelings towards Sophie and his commitment to her. Biological facts may be considered when, in a custody dispute, the child's best interests and welfare are of paramount concern. Biological evidence is perhaps not a controlling factor but it is a factor to be considered by the court. LSA-C.C. arts. 146 and 184; Finnerty v. Boyett, 469 So.2d 287 (La.App. 2d Cir.1985); Gautreaux v. Allen, 345 So.2d 103 (La.App. 1st Cir.1977). The evidence was admissible as bearing on Sophie's best interest. The trial court's decision to admit testimony concerning Sophie's paternity was not erroneous.

ASSIGNMENT NO. 2
Appellants' second assignment is that the court erred in failing to set aside *969 the December 31, 1986 order appointing the McKenzies as tutors of Saphronia. The Hugheses argue that they did not receive notice of the petition, and that the order was issued in an improper venue.[1] As noted, the district judge declined to rule on the question of the tutorship order's validity.
Without discussing the merits of appellants' arguments we find that the tutorship order was not properly issued. There is no occasion for tutorship absent the death of one parent or the separation from bed and board of the parents. LSA-C.C. art. 246; Belk v. Montgomery Ward and Co., Inc., 501 So.2d 1008 (La.App. 2d Cir.1987); Guillory v. Ortego, 449 So.2d 182 (La.App. 3d Cir.1984). Neither of Saphronia's parents is deceased, and at the time the order was issued the Hugheses were residing together, and were not, nor had they ever been, judicially separated.
Accordingly, we find the appellants are correct in their contention that the tutorship order issued December 31, 1986 must be declared null and void and set aside.

ASSIGNMENT NO. 3
In their petition in rule, the Hugheses prayed to have the "residency order" of January 23, 1987, which effectively awarded the parties joint custody of Saphronia, declared null. They assign as error the trial judge's failure to do so, arguing that Mrs. Hughes's signature on the joint motion for an order of residency was obtained by ill practices.
Nullity is not an appropriate or necessary remedy for a child custody case, since custody orders are always subject to change. The proper remedy is to file for a change of custody. Espenan v. Espenan, 403 So.2d 115 (La.App. 4th Cir.1981). This was done in the instant case. Plaintiffs are in no way prejudiced by the existence of the prior order, which was not a considered decree.
We find no merit in this assignment of error.

ASSIGNMENT NO. 4
Appellants' final assignment of error is that the court erred in awarding custody of Saphronia to the McKenzies. The appellants contend the appellees failed to meet their burden of proof, in that they did not show a sufficiently grave detriment to Sophie to prevent her parents from taking custody.
In a habeas corpus action by a parent against a nonparent, the district court has jurisdiction to consider if there are compelling reasons not to award the parent custody and, if so, to award custody on the basis of the best interest of the child. Wood v. Beard, 290 So.2d 675 (La.1974); Girouard v. Halpin, 368 So.2d 1139 (La. App. 3d Cir.1979).
In child custody cases, the trial judge is vested with a vast amount of discretion in making a determination of custody. A trial judge's decision in child custody cases will not be overturned in the absence of a clear showing of abuse. Lions v. Lions, 488 So.2d 445 (La.App. 3d Cir.1986).
In a custody contest between parents and nonparents, the parents enjoy a paramount right to custody of the child as against the nonparents, and may be deprived of such right only for compelling reasons. Burt v. McKee, 384 So.2d 489 (La.App. 2d Cir.1980); Gordy v. Langner, 502 So.2d 583 (La.App. 3d Cir.1987), writ denied 503 So.2d 494 (La.1987). These compelling reasons must be expressly determined and supported by convincing proof. Wood v. Beard, supra; State In Interest of Jones v. Jones, 430 So.2d 169 (La.App. 2d Cir.1983).
By its own terms C.C. art. 146 arguably does not govern a custody dispute such as this, which is not incidental to divorce or judicial separation of the parents. However, in similar factual situations several courts have found art. 146(B) to be useful as a guideline or directly applicable. Pounders v. Rouse, 528 So.2d 672 (La.App.
*970 2d Cir.1988); McManus v. McManus, 528 So.2d 696 (La.App. 2d Cir.1988); Diggs v. Tyler, 525 So.2d 1263 (La.App. 1st Cir. 1988); In re Bourg, 501 So.2d 862 (La.App. 5th Cir.1987); In re Custody of Reed, supra; Johnson on Behalf of Johnson v. Earls, 464 So.2d 463 (La.App. 1st Cir.1985).
We choose to apply the standards enunciated in art. 146(B). By its own terms this article is applicable to custody disputes incidental to divorce and separation litigation. It is also applied to proceedings in which both parents seek custody of a formally acknowledged illegitimate child, LSA-C.C. art. 245, and to custody disputes between a parent and nonparent over an informally acknowledged illegitimate child. Walker v. Washington, 540 So.2d 1002, (La.App. 2d Cir.1989). This legislative and judicial expansion of the scope of art. 146(B) reflects a change in perceived mores relative to custody disputes. We see no persuasive rationale for not applying art. 146(B)'s standards, with their greater emphasis on the welfare of the child, to a custody dispute between parents and nonparents which is not incidental to a judicial separation or divorce.
C.C. art. 146(B) expands the jurisprudential rule set forth in Wood v. Beard, supra, which required a finding that the parent is unable or unfit to provide a home for the child or a finding that the parent has forfeited the paramount parental right before custody could be taken from the parent. Recknagel v. Roberts, 465 So.2d 844 (La. App. 2d Cir.1985), writs denied, 468 So.2d 570 (La.1985) and 468 So.2d 579 (La.1985); Boyett v. Boyett, 448 So.2d 819 (La.App. 2d Cir.1984); In re Bourg, supra.
Article 146(B) sets forth a dual-pronged requirement which must be met before a natural parent may be denied custody of his or her child and the child placed in the custody of a nonparent; the trial court must determine that an award of custody to the parent would be detrimental to the child and that the award to a nonparent is required to serve the best interests of the child. Lions v. Lions, 488 So.2d 445 (La. App. 3d Cir.1986); Boyett v. Boyett, supra.
The burden of proving that the parents' custody would be detrimental lies with the nonparent. Gras v. Gras, 489 So.2d 1283 (La.App. 2d Cir.1986), writ denied, 493 So. 2d 1222 (La.1986); Boyett v. Boyett, supra. The term "detrimental to the child" includes parental unfitness, neglect, abuse, abandonment, and forfeiture of parental rights, and is broad enough to include any other circumstances, such as prolonged separation of the child from its natural parents, that would cause the child to suffer substantial harm. M. Moreau and C. Ho, "Child Custody Awards to Non Parents Under article 146(B)," 33 Loy.L.R. 51, 59 (1987).
The trial court found that Carl and Jackie Hughes had not yet established a stable home and a commitment to Sophie. Based on the evidence of Carl's past infidelity, the last instance of which occurred after the Hugheses' latest reconciliation, the numerous separations and reconciliations between Jackie and Carl, the fact that Carl believed he was not Sophie's biological father, the length of time the Hugheses voluntarily allowed Sophie to remain with the McKenzies, and the infrequence of their visits during those four years, we cannot say this finding is clearly wrong. The trial judge had the opportunity to see and hear the witnesses and to evaluate their sincerity and credibility.
Meriweather, the social psychologist, testified Sophie would be extremely traumatized if she were to be abruptly uprooted at this time from the only home and parents she has known, and given into the custody of her natural parents. It can be argued that the separation and attendant trauma would cause only a temporary, rather than permanent, detriment that would not rise to a level that would preclude awarding custody to the child's natural parents. See "Child Custody Awards to Non-Parents Under Article 146(B)," supra; Boykin v. Corless, 488 So.2d 1153 (La.App. 2d Cir. 1986). However, under certain exceptional circumstances the child may suffer permanent emotional harm. Significant factors in such a case would include individual traits in the child such as developmental *971 difficulties, abnormal overdependency or emotional instability; multiple placements in the past; and the quality and kind of substitute care given by the parents after the change in custody. See "Child Custody Awards to Non-Parents Under Article 146(B)," supra.
The trial judge obviously concluded that the significant trauma that Sophie would suffer upon being abruptly and permanently removed from the McKenzie home, coupled with the real danger of being placed in a home of doubtful stability with parents who had not demonstrated a significant commitment, posed too great a risk of permanent harm to Sophie and provided compelling reasons for not awarding custody to her parents at that time. After careful study of the record, we cannot hold the trial judge manifestly erroneous in this conclusion.
We recognize the difficulty and futility of attempts to reconcile the many reported opinions in child custody disputes. Appellate courts do not presume to lay down hard, fast rules and guidelines to apply to every case. Counsel should guard against culling a factor or legal principle from one case and asserting that factor or principle as controlling in another case because each case deals with a peculiar parental relationship which will exist prospectively and last only as long as the circumstances in the relationship do not change. The only common features in these cases are the principles that each case must be determined on its own facts and, in the absence of a showing of a clear abuse of discretion, the appellate court will uphold the trial court's judgment. Tabor v. Tabor, 421 So.2d 1185 (La.App. 2d Cir.1982).
The trial judge also found that the McKenzies carried their burden of proving that custody of the nonparents is required for the present to serve the child's best interest. Again, we cannot hold that the trial judge was manifestly erroneous in so finding. The record reveals that the McKenzies have a warm and loving relationship with Sophie, they provide her with the necessities and many of the amenities of life, and Meriweather opined that it was in Sophie's best interest to remain with the McKenzies at this time.
As the trial judge specifically stated, the judgment rendered below does not preclude the Hugheses from later gaining custody of Sophie. The custody plan developed by the judge provides for continuing contact between Sophie and her parents, to allow bonds to develop between them.
We affirm that portion of the judgment awarding custody of Sophie to the McKenzies and liberal visitation to the Hugheses, and amend the judgment to declare the tutorship order of December 31, 1986 in proceedings number 15,113 on the docket of the Sixth Judicial Circuit, Parish of East Carroll, null and void and of no effect.
Costs of this appeal are assessed one half to the appellants and one half to the appellees.
AMENDED IN PART AND AFFIRMED.
HIGHTOWER, J., dissents with written reasons.
HIGHTOWER, Judge, dissenting.
I respectfully dissent from that portion of the opinion affirming the award of custody of Saphronia Hughes to the McKenzies.
After recognizing that the statute "arguably does not govern a custody dispute such as this, which is not incidental to divorce or judicial separation of the parents," the majority has proceeded to apply the standards of that statute, Civil Code Article 146(B), to this case in which a mother has previously allowed a relative to care for her child because of financial, marital and health difficulties. While the majority saw no persuasive rationale for not applying those standards, I question that application.
First, Art. 146 is found in Book I, Chapter 3 of the Civil Code, entitled "Of the Provisional Proceedings to Which a Suit for Separation or Divorce May Give Occasion." Thus, the title of the chapter, as well as the plain wording of Art. 146, indicate that the legislature did not intend for the article to have application in custody disputes arising *972 outside of suits for separation or divorce. Mr. and Mrs. Hughes have never been judicially separated or divorced and the present proceedings do not involve separation or divorce. Furthermore, the title of Art. 146, "Custody of Children Pending the Litigation," indicates the article's envisioned use is in cases involving a mere temporary award of custody. This award of the custody of Saphronia Hughes to the McKenzies will be permanent unless the Hugheses institute successful change of custody litigation in the future.
Second, parties to a suit for separation or divorce, who both claim provisional custody, invite the state, through the judiciary, to decide the issue of custody of their children. The Hugheses, on the other hand, never invited the state to decide the matter of Saphronia's custody. Instead, they have simply asked for the return of their child to their family. Freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment, Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), and the risk of error through state intrusion is substantial and obvious. Nor does this fundamental liberty interest of natural parents in the care, custody, and management of their children evaporate simply because they have not been model parents or have even lost temporary custody of their child to the state. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). A fortiori, this fundamental liberty interest does not disappear when a parent voluntarily gives temporary custody of a child to a relative during times of difficulty. Otherwise, any parent making such a choice in a crisis situation places at risk all rights to their child.
Thus, I question the advisability of applying the standards of 146(B), designed for determining temporary custody when the parents have involved the state in a dispute, to parent-nonparent permanent custody cases in which the parents have not involved the state. Certainly, applying the standards of 146(B) in the latter cases, without recognizing the different equitable considerations presented, can easily result in overemphasis on the "best interests of the child" at the expense of a parent's fundamental liberty interest in the care, custody, and management of his or her child. I am of the opinion that the Hughes' right to their own child has received inadequate consideration in this case.
Even in those instances in which Art. 146(B) has found jurisprudential application resulting in an award to a nonparent, the circumstances have not paralleled the present case. The parents of this child are married and living together with their other four children for whom they provide a reasonably adequate home, although not the materially advantaged home that the nonparents can provide, and they seek return of their own daughter to live in their own home with her sisters.
By contrast, such favorable circumstances did not exist in Boyett v. Boyett, 448 So.2d 819 (La.App. 2d Cir.1984); Johnson on Behalf of Johnson v. Earls, 464 So.2d 463 (La.App. 1st Cir.1985); and Carroll v. Carroll, 476 So.2d 976 (La.App. 1st Cir. 1985), all three cases involving a custody award to nonparents. In Boyett, supra, the mother had been incarcerated for distribution of drugs. The father had both a drinking problem and a substance abuse problem, and made little effort to contact his daughter over a four and one-half year period. In Johnson, supra, the mother, who gave birth to the subject child and two others out of wedlock, was living with her mother. The father, who was married to another woman, was also living with his mother. Additionally, the father was a party to the suit only because he was joined as an indispensable party. Similarly, in Carroll, supra, the father and mother were no longer married. After separation of the parents, the father, while living in the home of his mother, paid no attention to the children. The mother, who only visited sporadically, was shown to have physically abused one of the children. The doctor testified that there was no doubt in his mind that burns found on one of the children were intentional, and the child herself told the doctor that her "mommy burned" her.
*973 The majority acknowledges: 1) in a custody contest between parents and nonparents, the parents enjoy a paramount right to custody of the child, and may be deprived of such right only for compelling reasons; 2) these compelling reasons must be expressly determined and supported by convincing proof (clear and convincing evidence); and, 3) the burden of proof lies with the nonparents. With regard to "compelling reasons," the majority admits that Art. 146(B) sets forth a two-pronged test which requires both a determination that an award of custody to the parent would be detrimental to the child and that the award to a nonparent is required to serve the best interests of the child. Thus, even applying the standards of Article 146(B), a salient question persists as to what constitutes sufficient detriment to the child to require custody be awarded to a nonparent.
In the cases of Boyett, supra, and Boykin v. Corless, 488 So.2d 1153 (La.App. 2d Cir.1986), this court held that under Art. 146(B) a parent's paramount right of custody can only be outweighed by a sufficiently grave detriment to the child's best interests which requires custody to be awarded to a nonparent. A "sufficiently grave detriment" clearly requires more than the disruptive effect and change of life-style that almost invariably accompanies the reuniting of a child with its parents following a prolonged period of custody by a nonparent.
In Boykin, supra, we affirmed the trial court decision returning custody of a child to his parent following a four and one-half year period of custody with the child's grandparents, where the trial court found that although a change of custody might be temporarily detrimental to the child, custody with the nonparents was not required to serve the child's best interests. Similarly, in In re Custody of Reed, 497 So.2d 1084 (La.App. 4th Cir.1986), in which a two-and-one-half-year-old child had been raised from birth by nonparents, the court recognized that the short term effect of returning custody to the biological mother would be detrimental to the child. However, the court found that it was also appropriate and necessary for the court to consider the rights of the biological mother. The court stated that the "best interest of the child" must be cautiously weighed against the rights of the parent, and that while it certainly may be in the best interest of many children if they were reared in homes other than that of their parents, that test, standing alone, cannot be used to deprive a mother of the custody of her child. Custody was given to the mother.
Hence, recognition of the need to cautiously weigh the best interests of the child against the rights of the parents is not a new idea in our jurisprudence. Nor is recognition of the need to distinguish between the short term detrimental effect of returning custody to the biological parent and the long term or severe detriment to a child which can occur in exceptional cases.
The concurring opinion of the late Justice Tate in State v. Peniston, 235 La. 579, 105 So.2d 228 (1958), not only emphasizes the importance of giving adequate weight to a parent's right to his or her child, but also foreshadows the detriment standard of Art. 146(B):
In my opinion ... the sole question is not ... whether it would be to [the minor child's] better interest to remain with her aunt and uncle rather than her parents.
The right of a parent to his child existed before governments or other social institutions of mankind. This natural right proceeds from our Creator and exists independently of the state; the state... does not in my humble opinion possess the power to take away in favor of a stranger the God-given right of a parent to his child, in the absence of the parent's forfeiture or abandonment of such right or of positive detriment to the child.

Id. at 232 (emphasis added).
Justice Tate also indicates that the temporary detriment occasioned by returning a child to his parents is not the kind of "positive detriment to the child" that would be sufficient to allow a child to be left with nonparents:
Thus, in advance of a finding that the parents have abandoned their right to their daughter, I regard as of no legal *974 consequence the testimony of the psychiatrist that the child would be happier with her aunt than with her mother, or the testimony that [her] baton-twirling activities would be disrupted by her return to the rural and more humble home of her parents (in which, perhaps, the less glamourous duties of learning kitchen chores awaited her), or even the rather heart-breaking testimony of the child's own preference for her aunt and uncle and of her great unhappiness when she learned that her parents wished her to remain in their (and her) home.
Id. at 232.
In "Child Custody Awards to Nonparents Under Art. 146(B)," 33 Loyola L.Rev. 51 (1987), the authors, one of whom is a child clinical psychologist, are sharply critical of testimony of expert witnesses, hired by nonparents, claiming that separation per se will cause serious and permanent psychological harm:
Expert testimony that separation per se is harmful should be viewed with skepticism for several reasons. The theories espoused by Goldstein, Freud, and Solnit in Beyond the Best Interest of the Child have been extensively criticized. Permanent detriment from severance of a psychological parent relationship is not the typical outcome. More recent literature indicates that separation per se is not harmful and that a proper assessment of the effects of separation on a child requires an individualized consideration of a multitude of factors.
. . . .
Dire predictions of serious harm by advocates of the psychological parenting theory must be placed in their proper perspective. Most children do not suffer severe or permanent harm from separation per se. Applied to parent-nonparent litigation, the recent psychological studies suggests that the quality of care by the parent would be a significant factor in assessing the probability of serious emotional harm to the child. In addition, the individual traits of the child are important in assessing whether the child will experience long-term detriment. For example, if the child has developmental disabilities, abnormal overdependency, emotional instability, or has had multiple placements in the past, he may be more vulnerable to separations than the average child. Individual factors, which indicate a vulnerability to harm from separation, should be fully developed since recent studies indicate that permanent detriment is the exception rather than the rule.
Id. at 66, 70.
In summary, even applying the standards of Article 146(B), in a child custody dispute between parents and nonparents resulting from a voluntary surrender of custody, the nonparents should have the burden of proving by clear and convincing evidence that an award of custody to the parent would be detrimental to the child and that the award to a nonparent is required to serve the best interests of the child. In evaluating the severity of the detriment to the child, a court should distinguish between the typical short term detriment associated with returning the child to his parents and the serious long term detriment to which certain children are susceptible. Furthermore, a court should not be too quick to accept the testimony of expert witnesses who predict the less likely outcome of long term detriment without assessing the quality of care a parent can provide, and without fully developing the individual factors which indicate a vulnerability of a particular child to harm from separation.
As grounds for denying the Hugheses custody of their child, the majority opinion seemingly focuses on the potential for instability in the Hughes home and the trauma that could be caused by a custody change.
The psychologist, who testified on behalf of the McKenzies that Saphronia would be "extremely traumatized" if she were returned to her natural parents, had met only once with the McKenzies and Sophie, that occurring for about two hours approximately a week before the trial. The psychologist never saw the Hugheses, and did not articulate any individual factors, such *975 as abnormal overdependency or emotional instability, which would indicate a vulnerability of Sophie to severe or permanent harm from separation. Instead, the psychologist conceded that with support from both families the child could be returned to the Hugheses. Under these circumstances, the psychologist's testimony not only should be viewed with skepticism, but also should be recognized, at best, as falling far short of establishing the grave detriment necessary to award custody to a nonparent.
Furthermore, as the majority opinion indicates, Sophie relates well to her four sisters and her parents when visiting the Hugheses, and Mrs. Hughes is a good housekeeper who keeps her children clean and well-fed. Additionally, there were no allegations that the children were either physically abused or neglected. Thus, although the McKenzies may be able to provide Sophie with more material advantages, the record does not indicate that the Hugheses are unable or unfit to have custody of their daughter.
While the trial judge found that Carl Hughes had not proven his reliability or dependability as a father figure for Sophie, the burden of proof was on the McKenzies, not the Hugheses, to show by clear and convincing evidence that the parents should not be awarded custody. Mr. Hughes is steadily employed and carries medical and dental insurance on Sophie. Furthermore, while not in any way condoning his past indiscretions, the jurisprudence of this state is replete with cases involving adulterous relationships by one parent which were insufficient to support an award of custody to the other parent. Despite the trial court's implied concern, there is no evidence that Carl Hughes has ever behaved inappropriately with regard to any of his daughters, or that his involvement with Ms. Martin was continuing at the time of trial. To the contrary, the record indicates that the relationship between Mr. and Mrs. Hughes has become more stable since their reconciliation and the reaffirmation of their wedding vows in early 1986. It is also observed that there is testimony of Mr. McKenzie making improper advances toward Ms. Martin.
Under these circumstances, I must conclude that even under the standards of Art. 146(B), the McKenzies failed to carry their heavy burden of proving by clear and convincing evidence that the Hugheses should not regain custody of their daughter. I would reverse the trial court and, following a graduated adjustment period, return the child to the home of her parents and sisters.

ON APPLICATION FOR REHEARING
Before FRED W. JONES, NORRIS, HIGHTOWER, SEXTON and LINDSAY, JJ.
Rehearing denied.
NOTES
[1] The order was issued in East Carroll Parish, where the McKenzies reside; the Hughes were living in Morehouse Parish.