906 So.2d 586 (2005)
Yvonne SMITH, Wife of/and Troy Smith, and Their Son, Troy Smith, II
v.
Melissa TIERNEY.
No. 2004 CU 2482.
Court of Appeal of Louisiana, First Circuit.
February 16, 2005.
*587 Thomas R. Caruso, Slidell, Counsel for Plaintiffs/Appellees, Yvonne and Troy Smith.
*588 Ernest E. Barrow, Covington, Counsel for Defendant/Appellant, Melissa Tierney.
Before: WHIPPLE, DOWNING, and HUGHES, JJ.
WHIPPLE, J.
This matter is before us on appeal by defendant, Melissa Tierney, the biological mother of the minor child, M.T., from a judgment of the trial court granting sole custody of the child to the paternal grandparents, Yvonne and Troy Smith ("the Smiths"), and awarding visitation privileges to the defendant. For the following reasons, we affirm in part, reverse in part, and render.

FACTS AND PROCEDURAL HISTORY
In contravention of the wishes of his parents, Troy Smith, II, son of Yvonne and Troy Smith, became involved with Melissa Tierney while both were students in high school. At the time their relationship began in 1997, Troy Smith, II was only fourteen years old and Melissa was seventeen years old. In the course of the relationship, Melissa became pregnant, near the end of 1997. The pregnancy later ended in a miscarriage in February of 1998. The Smiths disapproved of their son's relationship with Melissa from its inception, and after the first pregnancy ended, the Smiths asked Melissa to "stay away" from their son. However, Melissa refused to honor their request. After several incidents involving Melissa, Troy, II, and the Smiths, the Smiths filed a petition for a restraining order against Melissa on October 7, 1998. A restraining order was issued by the trial court prohibiting Melissa from coming within fifty yards of Troy, II and from contacting him by telephone or through the use of a digital pager. By Melissa's own admission, she violated the terms of the restraining order and became pregnant again. As a result of this pregnancy, M.T., the child whose custody is at issue herein, was born on August 13, 1999. At the time of M.T.'s birth, Melissa was eighteen years old. However, Troy, II was only fifteen years old, and thus, was a minor.
Within two weeks of M.T.'s birth, the Smiths began keeping M.T. at their home for periods of time. Over the course of her first year, the "visitation" gradually progressed until M.T. began living primarily at the Smiths' home. The Smiths provided virtually all financial support, and were the primary care givers for M.T. throughout her life. With the exception of a four week period when M.T. was seven months old, the Smiths provided all of the child's diapers, formula, etc. Accordingly, Melissa and the Smiths agreed that the Smiths would claim M.T. as a dependent on their income tax return.
When M.T. was approximately seven months of age, Melissa informed Yvonne that she was again pregnant with Troy, II's child and that Troy, II, who was still in high school, "did not care." Yvonne became very upset about the pregnancy and related issues. She assured Melissa that she and her husband were willing to take care of this child as well as continue to rear M.T. In response, Melissa took M.T. from Yvonne's home and told her that she would never see the child again.[1] The Smiths were not allowed to see M.T. for a period of four weeks. Eventually, Yvonne called Melissa and asked her to bring M.T. to their home on Easter Sunday. When Melissa and the child arrived, the child was sick and had to be taken to the doctor the next day. M.T. was eight months old at the time.
*589 Thereafter, M.T. continued to live primarily with the Smiths in their home, where she had her own bedroom, bathroom, and playroom. The Smiths enrolled M.T. in pre-school and dance lessons, clothed and fed her, and essentially provided for her every need. The Smiths took the child on various vacations and trips, and the Smiths planned and hosted M.T.'s first four birthday parties. M.T. also attended mass with the Smiths every week. Although Melissa was welcome to visit M.T. at any time, she took M.T. on only occasional outings and overnight visits. However, the Smiths included and invited Melissa to all family and holiday gatherings involving M.T. and informed Melissa of M.T.'s school events and functions so that Melissa could attend if she desired.
During this time, the Smiths encouraged Melissa to pursue an education and provided financial support to her as well, upon request. Although Melissa claimed to be attending school during this time, she made very little progress toward her education. She worked part-time as a waitress, but was seemingly unable to manage her financial affairs or to establish a steady residence. She essentially lived from place to place during this time, residing in various apartments or with a family member. Despite the Smiths' efforts to help Melissa and to foster a relationship between Melissa and M.T., Yvonne, who was not employed outside of the home, eventually assumed virtually all daily care for M.T. During this time, Melissa also became involved with various boyfriends, including at least one man she dated who, by his actions, manifested his objection to interracial relationships, such as the relationship between Melissa, a Caucasian, and Troy, II, an African-American.
Also during this time, there were several occasions when Melissa would go for periods of time without attempting to see M.T. On the occasions when Melissa did take M.T. for a visit, the visits were of short duration. Also, on those occasions when Melissa took M.T. with the intention of keeping her overnight, M.T. would generally end up back at the Smiths' home before the night was over, either because of a change in Melissa's plans or because the child wanted to return "home." M.T. eventually began calling Yvonne "mom" and her husband, Troy, "dad." She referred to her biological father as "Little Troy" and her biological mother as "Melissa."
In December of 2003 and January 2004, a series of events occurred resulting in the instant custody litigation after the relationship between the parties became strained and the existing custody arrangement became an issue. In particular, on a certain Saturday night, the Smiths were going to the movies with friends. M.T. had been visiting with Melissa that day. Melissa called, stating that M.T. was crying to go home and Melissa was wondering where the Smiths were. Yvonne explained that they were traveling on the interstate to meet their friends to go to a movie and that they would pick up M.T. after the movie. Melissa objected, stating that M.T. was crying and wanted to "go home," i.e., to the Smiths' home. When Yvonne refused to change her plans, Melissa became very angry and upset. This, however, was the only time that Yvonne refused to immediately pick up M.T. when asked to do so by Melissa.
As a result of the Smiths' refusal to cancel their plans and immediately turn around to pick up M.T., Melissa became very upset. Melissa informed Yvonne that she was tired of being Yvonne's "babysitter," that she was not going to be the babysitter anymore, and that she was "the mother." Melissa angrily told Yvonne that *590 she had been unhappy for a long time and blamed Yvonne, whom she had allowed to be M.T.'s mother for four years. Melissa warned that before M.T. was five years old, Melissa was going to be her mother. Melissa informed Yvonne that she no longer needed the Smiths and that she had family that M.T. could stay with when Melissa was busy doing things and living her life. Melissa stated that she would be making all the decisions from then on and that Yvonne was not to bring M.T. to her school any more. Melissa failed to return M.T. to her home with the Smiths.
Six days later, on January 30, 2004, the Smiths instituted the instant custody proceedings. An interim custody order was issued, awarding the Smiths custody of M.T. pending the outcome of a hearing on the Smiths' petition for temporary custody, temporary restraining order, permanent custody and contempt. Pursuant to the interim custody order, the Smiths were reunited with M.T. After a two day trial, the trial court took the matter under advisement. On May 7, 2004, the trial court rendered reasons for judgment, awarding sole custody of M.T. to Yvonne and Troy Smith and specific visitation privileges to Melissa. A judgment in conformity with the court's reasons was signed on June 22, 2004, resulting in the instant appeal by Melissa.
On appeal, Melissa contends the trial court manifestly erred by: (1) awarding custody to a nonparent when there was no evidence that the natural parent was unfit and unable to properly care for the minor child; (2) admitting Anna Pizza Caruso as an expert in the field of social work in the area of children; and (3) not taking into account acts of violence perpetrated by plaintiff, Troy A. Smith, II, that would limit his custody and visitation rights according to LSA-R.S. 9:364.

DISCUSSION

Assignments of Error Numbers One and Two[2]
The best interest of the child is the guiding principle in all custody litigation. LSA-C.C. arts. 131 and 134. In a conflict between a parent and a nonparent, the parent enjoys the paramount right to custody of a child and may be divested of that right only for compelling reasons shown by clear and convincing evidence. Robert v. Gaudet, 96-2506, p. 5 (La.App. 1st Cir.3/27/97), 691 So.2d 780, 783.
Thus, in an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would result in substantial harm to the child, thus necessitating an award of custody to a nonparent. LSA-C.C. art. 133. In this circuit, the words "substantial harm" carry no magical connotation. "Detrimental" and "substantial harm" have been used interchangeably in the jurisprudence. See Robert, 691 So.2d at 783. If divestiture or modification of parental custody is warranted under the article 133 test, custody is awarded in the best interest of the child in the following order of preference: to "another person with whom the child has been living in a wholesome and stable environment, or otherwise to any person able to provide an adequate and stable environment." LSA-C.C. arts. 133 and 131.
Keeping in mind that every child custody case must be viewed in light of its own particular set of facts, the trial court is in the best position to ascertain the best *591 interest of the child given each unique set of circumstances. Babin v. Babin, XXXX-XXXX, p. 7 (La.App. 1st Cir.7/30/03), 854 So.2d 403, 408, writ denied, 2003-2460 (La.9/24/03), 854 So.2d 338, cert. denied, 540 U.S. 1182, 124 S.Ct. 1421, 158 L.Ed.2d 86 (2004). In performing its function of deciding custody cases, the trial court is vested with vast discretion in matters of child custody and visitation because of its superior opportunity to observe the parties and the witnesses who testified at trial. Babin, XXXX-XXXX at p. 7, 854 So.2d at 408. Accordingly, on appellate review, the determination of the trial court regarding custody is entitled to great weight and should be overturned only when there is a clear abuse of discretion. Blackledge v. Blackledge, 94-1568 (La.App. 1st Cir.3/3/95), 652 So.2d 593, 595. Thus, as an initial custody contest between a parent and nonparents, the Smiths had the burden of proving by clear and convincing evidence that granting custody of M.T. to Melissa would result in substantial harm to the child.
The issue in the first assignment of error, is whether the trial court erred in divesting a natural parent of custody in awarding sole custody to related nonparents. In support, Melissa contends that there was no evidence that she was unfit or unable to properly care for M.T. Furthermore, Melissa contends that the record does not indicate that she is unable or unfit to have custody of her daughter and that there were no allegations that M.T. was either physically abused or neglected.
As set forth above, the applicable burden of proof and issue herein was whether, under the attendant circumstances, the Smiths established that granting custody to Melissa would result in "substantial harm" to the child. Whether or not a child has been abused is not the sole criteria for determining parental fitness. In such custody matters, the focus is always on the child's best interest in determining whether an award of custody to a parent would result in substantial harm to the child. Stated differently, "abuse and neglect" and "parental fitness" are not the exclusive factors to be considered in a "substantial harm" determination.[3]
In its reasons for judgment, the trial court found that removing M.T. from her home with the Smiths would cause M.T. substantial harm for the following reasons:
The evidence is clear that, despite previous problems between Melissa Tierney and the Smiths ... they helped her during and after the pregnancy. It is also clear that they have been the principal care givers for [M.T.] since her birth.
Numerous witnesses testified that [M.T.] views the Smiths as her `mom and dad' and their house is her home. The Smiths have paid for practically all [M.T.'s] expenses since her birth. They enrolled her in school, paid for her schooling and attended to all her medical needs. She attends church with them and is a part of family functions, which are numerous. It is clear the Smiths have diligently kept Melissa informed *592 of all [M.T.'s] activities and Melissa is always invited to all family parties as well as parties for [M.T.]. In fact, it appears Melissa had total access to [M.T.] at the Smiths' home and took [M.T.] to spend the night with her occasionally. The Smiths have also loaned Melissa funds from time to time and have claimed [M.T.] as a dependent on their income tax returns with the knowledge of Melissa.
* * *
It is clear from the testimony that the Smiths have provided a wholesome and stable environment. Mrs. Smith is a stay-at-home mom and [M.T.] has a close relationship to her cousins and step-siblings (her father's children). Various neighbors, teachers and family members testified to [M.T.'s] attachment to the Smiths. The Court finds removing [M.T.] from the home of the Smiths [would] cause her substantial harm.
In finding substantial harm would result if the court granted custody to Melissa, the court utilized the criteria and factors set forth in Hughes v. McKenzie, 539 So.2d 965 (La.App. 2nd Cir.1989), writ denied, 542 So.2d 1388 (La.1989). However, the trial court also set forth other factors it had considered in reaching the conclusion that the Smiths should be awarded custody.[4] As an additional basis for finding that an award of custody to the parent would result in substantial harm to this child, the court noted as follows:
Melissa Tierney virtually abandoned [M.T.] and forfeited her parental rights to [M.T.] by allowing her to remain with the Smiths knowing they viewed [M.T.] (as [M.T.] apparently does also) as their child. Though she attended parties and dinners at the Smith home to be with [M.T.], her position is more in the nature of an older sister than a mother.
It is clear that the Smiths have endeavored to support the relationship between [M.T.] and Melissa. They have testified they will continue to do so if custody of [M.T.] is granted to them, and the court believes them. They managed to overcome their displeasure with Melissa, despite her flagrant disregard of the protective order granted here, and have even gone to the point of loaning her money. Though Melissa has exhibited a lack of discretion in her actions, to her credit she has never abused [M.T.] or neglected her. (Though the Court has some concerns about an accidental cigarette burn on [M.T.'s] face from Melissa's stepmother).[5] Melissa is somewhat irresponsible in her financial dealings (money judgments against her here and in Iowa; failure to pay her rent) and though attending school, has never successfully completed her course work. She testified she is currently seeking a real estate license and works full time as a waitress.
The trial court recognized that M.T. does not have the same level of attachment *593 to Melissa that she does to the Smiths, but that M.T. also loves Melissa. The trial court concluded that although legal custody of M.T. should be awarded to the Smiths, M.T. should also have a relationship with Melissa. Thus, the court awarded Melissa generous visitation privileges.
On review, while we are mindful of the trial court's concerns regarding Melissa's parental fitness, and agree that an award of sole custody to her at this point in the child's life would be contrary to the best interests of the child, we do not find that the circumstances herein warranted a complete divestiture of Melissa's parental custody of M.T.
The record reflects that the Smiths had been married for twenty-four years at the time of trial and had parented M.T. for virtually all of her life. They both testified that they love M.T. very much and have attempted to provide for her every possible need on a daily basis for her entire life. M.T. considers their home her home and is very comfortable with them. M.T. calls Yvonne and Troy "mom" and "dad." The Smiths have always included Melissa in M.T.'s life and testified that if awarded custody, they would continue to encourage a relationship and involvement between Melissa and M.T.
In addition to the Smiths' testimony, the trial court considered the testimony of M.T.'s teacher, a neighbor, and family members. M.T.'s teacher, Brandi Hollingsworth, testified that Yvonne routinely brought M.T. to school and that M.T. was a normal, well-adjusted child who typically entered the classroom very happy and interacted socially with classmates. She testified that she noticed a recent and marked change in M.T.'s behavior and demeanor when Melissa began bringing M.T. to school a few days preceding the hearing. Ms. Hollingsworth testified that on the days when Melissa dropped M.T. off, M.T. seemed withdrawn and pulled away from friends in the class. Ms. Hollingsworth testified that M.T. was "not herself," and she became concerned that M.T. was actually ill.
A neighbor, James Montgomery, testified that he lived across the street from the Smiths for two years and that his children frequently played with M.T. He knew the Smiths and described them as great people. When Mr. Montgomery and his family first moved into their home, he thought that the Smiths were M.T.'s mother and father because they interacted in a "motherly and fatherly" way. Mr. Montgomery also met Melissa at the Smiths' home during swim parties and birthday parties. He testified that she appeared to be a part of the gathering and a welcomed visitor. While he witnessed interaction with M.T. and Melissa, he noticed that if M.T. needed something, she would usually go to the Smiths and ask for it.
Yvonne's sister, Paulette Carter, also testified. Mrs. Carter testified that she saw the Smiths three to four times a week and that her children, who were four and six years old, frequently played with M.T. Mrs. Carter described outings that she and Yvonne took the children on and described the relationship of her children with M.T. was that of "best of friends." She further testified that the Smiths have always provided for M.T.'s every need whether it be material, emotional, educational, or spiritual. She described the close nature of their family and how M.T. was a part of their family in every way. Mrs. Carter testified that she considered Melissa as one of her nieces and that the Smiths treated Melissa like family. She testified that Melissa looks to Yvonne and Troy Smith for guidance and that she has never witnessed Yvonne or Troy attempt to impede Melissa's relationship with M.T. in any way. She stated that she has never *594 heard the Smiths say anything negative about Melissa to M.T.
The trial court also accepted the testimony of Anna Caruso as an expert in the field of social work in the area of family and children. Ms. Caruso testified that after evaluating M.T. with the Smiths over the course of four sessions, the family presented as a "secure triad," which Ms. Caruso explained meant that M.T. rated as being securely attached to her caregiver, Yvonne, as the primary caregiver and that she also rated as being securely attached to Troy as her secondary caregiver. She noted that throughout the sessions, M.T. referred to Yvonne and Troy as "mom" and "dad." When asked to draw a family drawing, M.T. drew Yvonne and Troy, who she referred to as her "mom" and "dad," Callie, Colby (her half-siblings), and "Little Troy" and "Tammy" (her biological father and his wife). Notably, in one family drawing where M.T. omitted Melissa, Yvonne told her that she forgot to draw Melissa and encouraged M.T. to draw Melissa in the picture. Ms. Caruso testified that M.T. referred to her biological mother as "Melissa" and considered the Smiths' home to be her home. Based on her evaluation, Ms. Caruso opined that M.T. was a polite, respectful, happy child who viewed her grandparents as her mom and dad. She concluded that if M.T. were moved from this secure attachment, where she was securely bonded with the Smiths, the change would be harmful and significantly damaging for the child.
The trial court noted this expert testimony, stating in its reasons for judgment:
Anna Caruso, a clinical social worker presented and qualified as an expert, testified that separation from the Smiths would cause substantial harm to [M.T.]. She observed [M.T.] and stated that, in her expert opinion, [M.T.] was securely attached to the Smith[s].
After careful review of the record in its entirety, we find that the trial court abused its discretion in totally divesting Melissa of custody of M.T. While we agree that the record overwhelmingly supports the determination that domiciliary custody should be awarded to the Smiths, we are unable to conclude that Melissa should be divested of all custody rights to her child. Thus, we reverse the portion of the judgment that divested the mother of joint custody and awarded sole custody to the paternal grandparents. In light of the facts presented herein, however, we agree that an award of sole custody or domiciliary status to Melissa and removal from the Smiths' home, would result in substantial harm to M.T. The child's paternal grandparents, Yvonne and Troy Smith, are awarded joint custody and are designated as the primary domiciliary custodians. The visitation schedule set forth by the trial court is maintained.
In her second assignment of error, Melissa challenges Ms. Caruso's testimony, citing her "limited experience" and claiming that her expert opinion testimony failed to meet the Daubert standards.[6] Specifically, Melissa contends that Ms. Caruso failed to perform an evaluation of Melissa as required by Louisiana Statutory Guidelines for Child Custody Evaluations. Thus, Melissa contends that Ms. Caruso's testimony should be stricken.
In response, the Smiths cite Louisiana Code of Evidence article 702, which sets forth the general rule of admissibility of expert testimony in Louisiana, as follows:

*595 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The Daubert standard, which was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116, 1123 (La.1993), requires that expert scientific testimony rise to a threshold level of reliability in order to be admissible under LSA-C.E. art. 702. Terrebonne v. B & J Martin Inc. and XYZ Insurance Company, 2003-2658, p. 7 (La.App. 1st Cir.10/29/04), 906 So.2d 431, 437-38, 2004 WL 2415908.
The record reflects that Ms. Caruso possesses a master's degree in social work. Additionally, she completed professional internships, including two that were each two years long, i.e., at the University of New Mexico in Albuquerque in the Children's Hospital and at Dallas Child and Family Guidance Center in Texas. Both internships centered around work with children and families. She received honors in connection with her research and thesis work in graduate school and graduated Phi Kappa Phi.
In connection with her work as a counselor, she has previously been accepted and has testified as an expert in court. Ms. Caruso is licensed by the State of Louisiana and her continuing education training is predominantly concentrated in attachment and bonding issues of pre-school children ages zero to five. Since obtaining her education and training, she has been engaged as a consultant or to provide professional services in connection with social work in a governmental and private capacity. She was accepted by the court as an expert in the field of social work in the area of children.
In providing testimony in this case, Ms. Caruso explained that she routinely used generally accepted scales to weigh or rate the bonding between children and their caretakers and other customary procedures in conducting her evaluations. She recognized that M.T. related to Yvonne as her primary caregiver and to Troy as her secondary caregiver. Ms. Caruso stated that although she did not evaluate the relationship between M.T. and Melissa, she deemed it noteworthy that M.T. did not include Melissa in either of the pictures that she drew.
We find no error by the trial court in allowing the testimony of Ms. Caruso. As the trier of fact, the court could consider her specialized knowledge in attempting to understand the evidence or in determining facts at issue. See LSA-C.E. art. 702. Moreover, while the trial court noted Ms. Caruso's findings, the trial court clearly weighed and considered many factors in making its determination that removing M.T. from her longtime home with the Smiths would result in substantial harm to the child. Moreover, on review, we do not find that the trial court improperly or solely relied on Ms. Caruso's testimony in making this finding. See Timmons v. Timmons, 605 So.2d 1162, 1166 (La.App. 2nd Cir.1992), writ denied, 608 So.2d 195 (La.1992).
Instead, the evidence clearly reflects that the Smiths have consistently provided financial, spiritual, educational, and emotional support for M.T. and have lovingly cared for her on a daily basis for the majority of her life. Moreover, the record shows that while the Smiths have always encouraged and supported a positive relationship between Melissa and the minor child, Melissa demonstrated a troubling pattern of taking M.T. from the Smiths *596 only as a retaliatory tactic to punish the Smiths when she became angry or unhappy with them.
After a thorough review of the record, we find no error in the trial court's acceptance of Ms. Caruso's testimony as an expert, given her qualifications to give expert testimony; nor do we find the court gave improper weight to this testimony.
This assignment lacks merit.

Assignment of Error Number Three
In Melissa's final assignment of error, she claims that pursuant to LSA-R.S. 9:364, a pending assault charge prohibits an award of custody to Troy Smith, II. Pretermitting comment on any alleged charge, we find no merit to this assignment. While Melissa correctly argues that LSA-R.S. 9:364 creates "a presumption that no parent who has a history of perpetrating family violence shall be awarded sole or joint custody of children," we find the statute inapplicable herein. Although his name appears on the original petition for custody herein, the judgment rendered by the trial court awarded sole custody to Yvonne Smith and her husband, Troy Smith, not their son, Troy Smith, II. Because he was not awarded custody of M.T., this statute is inapplicable herein.
Thus, this assignment also lacks merit.

CONCLUSION
For the foregoing reasons, the June 22, 2004 judgment of the trial court awarding sole custody of the minor child, M.T., to her paternal grandparents, Yvonne and Troy Smith, and reasonable visitation to Melissa Tierney, is reversed in so far as it divests Melissa of custody and awarded sole custody to the Smiths. The parties are hereby awarded joint custody of M.T., with the Smiths designated as the primary domiciliary custodians and Melissa Tierney awarded reasonable visitation of the minor child, M.T. The visitation schedule for Melissa as set forth by the trial court is affirmed and maintained. In all other respects, the judgment is affirmed.
Costs of this appeal are assessed one-half to the appellant, Melissa Tierney, and one-half to appellees, Yvonne and Troy Smith.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
HUGHES, J., concurs with reasons.
HUGHES, J., concurs.
I concur. The best interests of the child are provided for. But it is disturbing that the child refers to the grandparents as "mom" and "dad" while referring to her dad as "Little Troy" and her mom as "Melissa." Honesty is the best policy.
NOTES
[1] The record does not establish the outcome of this third pregnancy.
[2] Although we generally first address alleged evidentiary errors, which may affect our standard of review, for ease of discussion and because we find no such errors herein, we have declined to do so.
[3] Nonetheless, we note, as did the trial court, that the record contains two incidences in which M.T. suffered injuries while in Melissa's care. First, M.T. suffered a cigarette burn on her face, inflicted by the mother of one of Melissa's boyfriends. In another incident, M.T. sustained a cut on her forehead during an altercation or argument between Melissa and a boyfriend in which the adults were throwing Barbie dolls at each other and one struck M.T. in the forehead. Although Melissa was not initially forthcoming about how M.T. was injured, the Smiths eventually were informed of the details of the incident by M.T.
[4] In Hughes, the Second Circuit Court of Appeal determined that the term "detrimental to the child" includes "parental unfitness, neglect, abuse, abandonment, and forfeiture of parental rights, and is broad enough to include any other circumstances, such as prolonged separation of the child from his or her natural parents, that would cause the child to suffer substantial harm." Hughes, 539 So.2d at 970. While this circuit has not adopted the factors set forth in Hughes as a bright-line rule, we find no error in the trial court's use of the Hughes factors as a guideline in its determinations herein.
[5] Although the trial court stated in its reasons that a cigarette burn found on M.T.'s face was inflicted by Melissa's stepmother, the testimony shows that the cigarette burn was actually inflicted by the mother of Melissa's boyfriend at the time.
[6] See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).